# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

| | | |
|---|---|---|
| CHRIS EPLER, ROBERT ARMER, RONALD CARTER, ROBERT CERONE, FRANCINE FREEBORN, and NAVIN KADAMBI, individually and on behalf of a class of others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. |
| v. | ) ) | |
| AIR METHODS CORPORATION, and ROCKY MOUNTAIN HOLDINGS, LLC, | ) ) ) | |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

Plaintiffs bring this action individually and on behalf of all others similarly situated, against affiliated Defendants Air Methods Corporation and Rocky Mountain Holdings, LLC for Declaratory Judgment under the Declaratory Judgments Act, 28 U.S.C. §2201. This case involves Defendants' practice of charging patients exorbitant and outrageously excessive sums for emergency medical air transportation rates, where no express or implied-in-fact contract exists between Defendants and the patient for such transportation. This practice implicates the intersection of the Airline Deregulation Act of 1976's ("ADA") preemption provision and 49 U.S.C. §41713(b)(1). Plaintiffs seek a declaration of rights, obligations, and relationship between Plaintiffs, Class Members, and the

Defendants relating to Defendants' claimed entitlement to payment for its emergency air transportation services.

## INTRODUCTION

1.    Plaintiffs bring this proposed class action on behalf of themselves and all others similarly situated who were charged by Defendants for the transportation of patients by air ambulance following a healthcare provider's determination, under the Emergency Medical Transportation and Labor Act 42 USC §1395dd ("EMTALA"), that the patient suffered from an "emergency medical condition" requiring immediate air transportation to an accepting medical facility capable of providing appropriate care. Defendants only provide emergency air transportation if requested by a healthcare provider who certifies that air transport is medically necessary.

2.    When a first responder or emergency room physician (collectively "healthcare provider") determines that a patient is suffering an emergency medical condition requiring treatment unavailable at the initial facility, or under emergent circumstances, such that immediate transportation by air is necessary to receive appropriate healthcare, the healthcare provider contacts an appropriate receiving hospital, and upon their acceptance, contacts Defendants to provide the necessary transport to the receiving hospital.[1]

---

[1] "Emergency Medical Condition" is defined in EMTALA as: "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical treatment could reasonably result in (i) placing

3.     Given the inherently extreme circumstances necessary to justify an emergency medical condition requiring immediate transportation by air, the need for emergency transportation is acute in every instance. As a condition of transport, Defendants require a certification of necessity from the treating healthcare provider. The transported patient does not engage in any aspect of the air transportation, and Defendants do not enter any negotiations nor any contract with the patient. The patient does not and cannot make the request for transport, has no choice in the transport provider nor in whether to accept the transport other than to refuse necessary and urgent medical treatment.

4.     The transportation is not a voluntary undertaking by Plaintiffs, but rather under the influence (and as a direct consequence) of an emergency medical condition requiring immediate medical care. Defendants do not engage in any discussion nor negotiation of the terms under which transportation will be provided. Given the dire circumstances, express or informed consent or negotiation of essential terms does not occur. The patients are frequently unconscious, and in all instances incapable of giving meaningful express or informed consent, or otherwise voluntarily assenting to the transportation by Defendants. Once requested, Defendants transport the patient as directed by the healthcare provider and do so without any agreement from the patient.

---

the health of the individual (or with respect to a pregnant woman, the health of the woman or unborn child) in serious jeopardy, (ii) serious impairment to bodily function, or (iii) serious dysfunction of any bodily organ or part".

5.      This case is brought on behalf of patients transported under the emergent medical circumstances described above. By virtue of the circumstances, no enforceable contractual relationship between Plaintiffs and Defendants is formed prior to transport.  Defendants do not disclose the amounts they intend to charge for such transportation.

6.      Defendants are air carriers and as such are subject to the ADA, and in particular its pre-emption provision, 42 USC §41713(b)(1).

7.      Plaintiffs have no legal obligation to pay Defendants, and Defendants have no legal entitlement to receive the price they charge for services absent an express or implied-in-fact contract, and one cannot be imposed on them by state law by virtue of the ADA pre-emption provision: "[A] state ... may not enact or enforce a law, regulation, or other provision having the forced and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart." No federal law imposes a legal entitlement to receive payment, nor any obligation on the transported patient to pay.

8.      Defendants know that the amounts they charge Plaintiffs far exceed the amount that third-party health insurers pay as the reasonable value of the transportation services Defendants provide. Defendants' executives admitted in a television interview that the "fair charge" for Defendants' services would be, on average, approximately $12,000, but Defendants routinely charge four times that amount and more.

9.    Upon information and belief, Defendants know that third-party payors will not pay the amounts Defendants charge. As a result, Defendants seek to directly negotiate network agreements with health insurers and other third-party payors to assure payment for their emergency air transportation charges. Under these network agreements, third-party payors agree to pay negotiated amounts that are far lower than the amount Defendants charge Plaintiffs and Class Members, and in exchange, Defendants agree not to balance bill insured patients for any amount over the network-negotiated amount. To enhance their negotiating position, Defendants use the threat of crushing medical charges imposed on out-of-network insureds as leverage to secure more favorable terms from the network. Defendants refuse to reduce their charged amounts to out-of-network patients to preserve their negotiation leverage. The amounts Defendants charge out-of-network patients is not the product of a competitive marketplace and is untethered from the "reasonableness" limitation otherwise imposed under State common law principles. In short, the only real marketplace for Defendants' rates is the negotiated price between third-party payors and Defendants, and not the "marketplace" of Defendants and out-of-network patients. As such, the prices Defendants charge are not the product of any competitive marketplace.

10.    Absent a network agreement, Defendants first seek payment from the patients' third-party payors through a form Assignment of Benefits ("AOB") wherein the Plaintiffs and Class Members assign all legal rights for reimbursements from their third-party payors to the Defendants. Under the AOB,

Defendants "stand in the shoes" of Plaintiffs and Class Members to enforce their contractual rights under the insurance policy, including the right to sue for the reasonable value of the transportation services provided. Upon receiving an AOB, Defendants submit a claim to Plaintiffs' third-party payor for reimbursement of the entire charged amount. When the third-party payor inevitably declines a significant portion of Defendants' charged amount as unreasonable, Defendants "balance bill" Plaintiffs and the Class for all unreimbursed amounts, notwithstanding that the charged amounts were never agreed to.

11.    It is also Defendants' practice to seek assistance from the patient in recovering the charged amounts by having the patient send requests for reconsideration of any partial denial to their third-party payors to induce increased reimbursement to Defendants. The "assistance" is in the form of documents, drafted by Defendants, for the patients to sign and send to third-party payors. Defendants call these documents their "UCR" package.

12.    Defendants' sole business is the transportation of critically injured patients at the request of healthcare providers seeking transfers under EMTALA. There is no contract between the patient and Defendants prior to transfer regarding the terms or price of that transfer, and no agreement between the certifying healthcare provider and the patient providing authority for the healthcare provider to contract for the terms and conditions of transfer and to bind the patients to any contract with Defendants.

13.     Defendants' prices (which are not revealed until long after the transport is completed) are based on a "flat charge" and an additional "per-mile" basis.

14.     Prior to transport, Defendants know (a) the services they will provide and (b) the price they will charge for those services – both the flat charge and the per-mile basis. Defendants only provide transportation services and do not bill for any medical treatment. At the time of transport, Defendants know, but do not disclose, their pricing.

15.     Defendants arrogate to themselves the right to bill Plaintiffs whatever Defendants, in their sole discretion, determine. Defendants claim there is no limit on the amount they can charge and that the charged amount is not subject to any limitation for reasonableness.

16.     Defendants present Authorization & Consent ("A&C") at the time of transport. Both the A&C and the subsequent AOB forms are prepared by Defendants purportedly to impose financial responsibility obligations on the patients that do not lawfully exist. These financial obligations are contained in a Financial Responsibility provision, which purports to hold the patient liable for whatever Defendants charge, without limitation, and includes rights to record liens on assets, charge interest, attorney fees, and collection costs. The financial terms may be presented to the patient, or to someone on behalf of the patient (if anyone), while the patient is suffering from an emergency medical condition, without any opportunity to negotiate terms and without disclosing the price charged for

Defendants' transportation services. The financial responsibility terms are embedded in form documents (A&C and AOB) which discuss multiple other issues relating to the terms of transport. The form documents are presented to the patient on a "take it or leave it" basis and are reasonably presumed by the patient as necessary conditions to transport.

17.      Neither the A&C nor the AOB are legally enforceable contracts to pay whatever Defendants charge, nor do they extinguish Defendants' obligation to charge only reasonable rates.

18.      Defendants send the charged amount as a demand for payment to Plaintiffs and affiliated third-party payors and, when not paid in full by the third-party payor, Defendants balance bill the patient.

19.      As is customary in the healthcare industry, patients routinely assign their insurance benefits (in both the A&C and AOB forms, for example) to the healthcare provider so the provider may file claims with third-party insurers to obtain payment benefits. Defendants use the assignment to file claims directly with third-party payors to obtain payment and assert that their services were for necessary, emergency medical transportation. The third-party payors make coverage determinations and issue an "explanation of benefits" (an "EOB") detailing the charged amounts and the reasons for the coverage determinations. This is followed by an appeal process which Defendants may, and frequently do, initiate.

20.    As part of their predatory scheme, Defendants, after transportation, have Plaintiffs sign the AOB without negotiation or modification. The AOB, like the pre-transport A&C forms, do not disclose the prices Defendants charge for their services – in fact, Defendants never disclose such prices until after completion of the claim process with third-party payors – and seek to bind Plaintiffs to pay whatever Defendants charge. These documents are not voluntary agreements, do not disclose essential terms, are not the product of mutual assent, and are unenforceable.

21.    In all cases, the third-party payors determined that the Defendants services were for emergent and medically necessary, and paid an amount determined by the insurance company to be reasonable for the services provided. When the amount paid is less that the amount charged, as is virtually always the case, Defendants enlist the assistance of the Plaintiffs in the claim process and provide form documents for Plaintiffs to sign and transmit to their third-party insurers.

22.    None of Plaintiffs' insurers or third-party payors had network agreements with the Defendants. As such, Defendants "balance billed" Plaintiffs the difference between third-party payor reimbursement and Defendants' charged amount. As part of the this process, Defendants also initiate collection efforts, telephone calls demanding payment, threats to turn the bills over to collection agencies, coercive payment plans, impose medical liens against third-party recovery, turn the unpaid amounts over to collection agencies, report the bills as

bad debt, make claims against the estates of deceased patients, seek to impose collection costs, attorney's fees and interest on unpaid amounts, and, in some instances, file state-court suits against patients.

23.    Defendants' charges are so exorbitant that almost no third-party payor pays them in full because they far exceed what would be a reasonable amount for the services provided. Thus, even after payment by third-party payors, there frequently remains a staggering amount left unpaid. Because Defendants' balance bills are so high, frequently in the tens of thousands, almost no Plaintiff can pay them and Defendants' collection rates for these receivables is low.

24.    After appeals for third-party payment are exhausted, Defendants proceed with collection efforts against the Plaintiffs. Despite possessing an AOB from the patient, Defendants do not initiate litigation against third-party payors to contest those payors reasonableness determinations. This is essentially a concession that the amounts Defendants charge are unreasonable – if the amounts were reasonable, Defendants could vindicate their rights by bringing suit against the third-party payors for wrongful refusal to pay the reasonable amount to which Defendants would be entitled. Defendants decline to do so precisely because Defendants are aware the amounts are unreasonable and unrecoverable.

25.    Upon information and belief, Defendants engage in this practice to:

       a. increase the economic pain on the Plaintiffs to give themselves leverage against third party payors to increase reimbursement rates;

      b.  threaten Plaintiffs with harsh collection efforts to coerce them into negotiated payment plans; and

      c.  gain negotiating leverage in obtaining terms more favorable to them in network agreements with third party payors.

26.    Defendants' billing practices as stated herein are predatory, unconscionable, and intended to inflict severe economic pain on critically injured Plaintiffs and their families solely for Defendants' benefit.

27.    If a patient contests the charges, Defendants assert that the ADA vests them with plenary power to set whatever price they choose for transportation of patients in extremis who have no ability to assent voluntarily to the transportation, or to pay the exorbitant amounts Defendants charge. Behind the shield of the ADA preemption provision, Defendants claim the unfettered right to charge any amount, and argues that this Court, along with all other courts, can act only as collection agencies for their charged amounts.

28.    The ADA, 49 U.S.C. § 41713(b)(1), provides:

[A] State, political subdivision of a State...may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

29.    Contrary to Defendants' claims, ADA preemption cuts both ways – it applies equally to Plaintiffs as to Defendants, to patients as to air transportation providers. There is no federal law mandating payment for air carrier services. Applying the ADA preemption provision to the Defendants forecloses Defendants

from employing or enforcing any State law having the force and effect of law "related to price, route or service of an air carrier."

30.    Three United States Supreme Court cases, *Northwest, Inc. v Ginsburg*, 572 U.S. 273, 280 (2014), *American Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995), and *Morales v. Trans World Airlines*, 504 U.S. 374, 383 (1992, constructed the provision broadly, excluding only privately ordered obligations. "[T]he terms and conditions airlines offer and passengers accept, are privately ordered obligations and thus do not amount to a State's enactment or enforcement of any law, rule, regulation, standard, or other provision having the force and effect of law within the meaning of the ADA pre-emption provision." None of these holdings found that Defendants may apply to state common law to establish a legal right to entitlement otherwise preempted under the ADA.  Many circuit court and district court rulings are in accord.

31.    Recently, the Tenth Circuit Court of Appeals in *Scarlett v. Air Methods*, 922 F. 3d 1053 (10th Cir. 2019) and the Sixth Circuit in *Byler v. Air Methods*, 2020 WL 4581252 (6th Cir. August 10, 2020) have held that a defendant must establish either an express contract or an implied-in-fact contract to have a legal entitlement to recover payment for their services; and that a suit under the Declaratory Judgment Act to declare whether such contract exists, and the respective rights of the parties *vis a vis* the ADA preemption, are not themselves preempted by the ADA. Because Defendants' legal entitlement to payment can only be premised upon express or implied-in-fact contracts to which both Defendants

and the patient mutually assent, the facts establish that Defendants' practices are uniform and lack the necessary mutuality of assent. In view of ADA preemption, the routine state common law implying an obligation to pay the reasonable value of services provided, in the absence of an express or implied-in-fact contract, are preempted by the ADA.

32.    Defendants have admitted that every patient they transport:

a.  is suffering from an emergency medical condition under EMTAL determined by a qualified healthcare provider;

b.  has not engaged in negotiations regarding financial responsibility due to the emergency circumstances;

c.  the only financial terms potentially disclosed to patients are those contained in the A&C, which is offered on a take-it-or-leave-it basis;

d.  Defendants fail to disclose that the transport will occur regardless of any agreement with the patient to pay, occurs at the request of the certifying healthcare provider and not the patient, and that the patient will be transported irrespective of signing any forms;

e.  that the only service Defendants provide is transportation as directed by certifying health care providers under EMTALA;

f.  no consent to transport is required from the patient;

g.  that Defendants have an independent obligation to transport the patient under EMTALA;

h.  that the transportation is not a voluntary undertaking by the patient; and

i.  that the rates charged by the Defendants are fixed at a uniform "base rate" and per mileage rates, for transport only and not for the provision of medical services while in route.

33.    After the transportation is complete, Defendants send a statement for the transportation showing a "base rate" and a "mileage" charge (collectively "charged amount") and demand payment from Plaintiffs.  The only services charged by Defendants are for transportation of the patient, not for the provision of any medical care. The rate that will be charged by Defendants for the "base charge" and "mileage" is known to Defendants prior the transportation, but it is not published on their web site nor otherwise disclosed to Plaintiffs prior to transport. Thus, Defendants seek to impose a unilateral price term on critically injured Plaintiffs who have never voluntarily contracted with Defendants.

34.    Because the air transportation services provided by the Defendants occur under a medical emergency, the patient transported, in fact and in law, suffers from the duress of a medical emergency rendering them incapable of entering any voluntary undertaking with Defendants.

35.    The Class includes the person(s) billed for transportation, usually the patient transported, the legal representative of the patient (in the case of spouses or children), the estate of a deceased patient, or any person Defendants have billed demanding payment for emergency air transport notwithstanding that they have no entitlement to such payment. For each transport, Defendants maintain detailed records with a unique identifier containing the identity of the patient transported and all demands by Defendants for payment.

36.    In this action, Plaintiffs, on behalf of themselves, seek declarations with respect to (a) Defendants' legal entitlement to payment from Plaintiffs in light

of the ADA's provision preempting all state common law that implies price terms, and (b) the nature and extent of any legal entitlement Defendants possess to receive payment in the absence of a non-preempted contractual right.

37.     In the absence of payment, Defendants initiate collections, report the amount charged as an unpaid bill to credit reporting agencies, engage in collection efforts, seek to enforce liens, charge interest and attorney's fees, and initiate lawsuits in state courts, or otherwise seek to enforce state law related to the price or services they provide. Defendants demand payment, initiate collection efforts, and threaten suit in state court for judgments based upon prices never disclosed, nor agreed upon prior to the transportation.

## **PARTIES**

38.     Defendant Air Methods Corporation is incorporated under the laws of Delaware with a principal place of business in Englewood, Colorado.

39.     Defendant Rocky Mountain Holdings, LLC, is a limited liability company organized under the laws of Delaware with a principal place of business in Cincinnati, Ohio. On information and belief, Defendant Rocky Mountain Holdings, LLC, regularly conducts business in Colorado. On information and belief, Defendant Rocky Mountain Holdings, LLC, is a wholly owned subsidiary of Defendant Air Methods Corporation.

40.     Plaintiff Robert Armer is the father of minor A. Armer, both of whom are citizens of Florida and reside in Holmes County.

41.    Plaintiff Ronald Carter is a citizen of Florida residing in Hillsborough County, Florida.

42.    Robert Cerone is a citizen of Florida who resides in St. Lucie County.

43.    Plaintiff Chris Epler is a citizen of Florida residing in Brevard County.

44.    Plaintiff Francine Freeborn is a citizen of Florida residing in Citrus County.

45.    Plaintiff Navin Kadambi is the father of minor A. Kadambi, both of whom are citizens of Florida and reside in Polk County.

## **PLAINTIFFS' FACTS**

### **Robert Armer**

46.    On May 7, 2019, A. Armer, an infant, suffered severe burns on over 40% of his body caused by a hot coffee spill. Plaintiff Armer's child was transported by Defendants from Healthmark Regional Medical Center in Defuniak Springs, Florida, to USA Children's Hospital of Southern Alabama in Mobile, Alabama.

47.    Plaintiff Armer accompanied his infant child on the air transport flight. Plaintiff Armer's wife, who traveled to the receiving hospital in her own personal vehicle, arrived *before* the air transport.

48.    Plaintiff Armer recalls signing an authorization form presented to him regarding the air transport but does not recall which form he signed. Under the terrible and emergency circumstances, Plaintiff Armer signed the forms presented to him because he reasonably believed they were necessary to obtain emergency transportation for his child. He had no discussion with Defendants

prior to the air transport and had no agreement with Defendants about the terms of the transport.

49.     Plaintiff Amer did not enter any contract with Defendants regarding any terms of transport and did not mutually assent to any contract with Defendants.

50.     Following the transport, Defendants billed Plaintiff Armer $69,999.00, which included a "base" charge of $37,967.38 and an additional $32,031.62 for mileage. The trip was roughly 149 miles, making the charge per mile $214.98, in addition to the almost-$40,000.00 "base" charge. Exhibit 1. The charge assessed was subject to Defendants' arbitrary cap at the given time; Defendants periodically and arbitrarily increase the cap by $5,000 increments.

51.     Plaintiff Armer's son was covered by Medicaid administered through Humana. Plaintiff Armer believes that Defendants submitted a claim through Humana seeking reimbursement for their claim.

52.     Defendants have repeatedly billed Plaintiff Amer since January 2020 and have placed phone calls to Plaintiff demanding payment.

53.     Plaintiff Armer has been subjected to Defendants' oppressive billing and collection practices as aforesaid, damaging his credit and causing substantial hardship.

### Ronald Carter

54.     On October 15, 2016, Plaintiff Carter was seriously injured from an accidental firearm discharge. His brother transported him to Highlands Regional

Medical Center in Sebring, Florida, and remained with him. The bullet fractured Plaintiff Carter's femur and tore multiple ligaments. Though Mr. Carter was initially stable, his condition eventually deteriorated to the point where his healthcare providers determined that he suffered from an emergency medical condition that required his transfer to another medical facility for appropriate care. As a result, the healthcare providers contacted Defendants for air transport to a facility willing to accept the patient for further medical care.

55.     Under the emergency circumstances, Plaintiff Carter signed the forms presented to him regarding transport reasonably believing they were necessary to obtain emergency transportation. He had no discussion with Defendants prior to the air transport and had no agreement with Defendants about the terms of the transport.

56.     Following the air transport, Defendants billed Plaintiff Carter $59,999.00, which included a "base" charge of $ 32,957.57 and an additional $27,041.43 for mileage. The trip was 78 miles, making the charge per mile $346.69, in addition to the "base" charge. Counting the "base" charge, the 78-mile trip cost an incredible $769.21 *per mile*.

57.     Plaintiff Carter was insured by Blue Cross Blue Shield of Texas ("Blue Cross"), and Defendants submitted their charges to Blue Cross for payment. In response, on June 4, 2017, Blue Cross determined that Defendants' charged amount was unreasonable and reimbursed only $10,688.16, issuing an EOB to that effect. Exhibit 2. Defendants balance billed Plaintiff Carter $49,310.84 *Id.*

58.    Plaintiff Carter did not enter any contract with Defendants regarding any term of transport and did not mutually asset to any contract with Defendants.

59.    The balance billed amount of $49,310.84 remains unpaid.

60.    Plaintiff Carter has been subjected to Defendants' oppressive billing and collection practices as aforesaid, damaging his credit and causing substantial hardship.

## Navin Kadambi

61.    On April 2, 2018, Plaintiff Kadambi's minor son, A. Kadambi, was in a motor vehicle accident that caused his right lung to collapse. Fluids were present in both his lungs, making it very difficult to breathe. A. Kadambi was taken to the emergency room at Lakeland Regional Hospital in Lakeland, Florida, where healthcare providers determined that he suffered from an emergency medical condition requiring immediate transfer to St. Joseph Children's Hospital in Tampa, Florida, for appropriate pediatric care. Lakeland Regional contacted Defendants for the child air transport and transfer to St. Joseph's. The healthcare providers executed a "Certificate of Necessity for Air Medical Transport" prepared by Defendants. The "Certificate of Necessity for Air Medical Transport" is one of Defendants' form documents executed for each transportation.

62.    Plaintiff Kadambi's wife, who had remained with the other children, traveled to the second hospital in her own personal vehicle and arrived before the air transport.

63. While at Lakeland Hospital, Defendants presented Plaintiff Kadambi with an A&C form, which Plaintiff signed. There was no discussion nor negotiations regarding the A&C, and it was Plaintiffs' reasonable understanding that the form was necessary for his son to received appropriate medical care and transport. Plaintiff Kadambi does not recall signing any forms from Defendants prior to or during the transport in which he consented to pay such sums for services provided by Defendants. However, he is in possession of an executed A&C form dated April 2, 2018. Exhibit 3.

64. Following the transport, Defendants billed Plaintiff Kadambi $51,179.55, which included a "base" charge of $36,332.43 and an additional $14,847.12 for mileage. The trip was roughly 36 miles, making the charge per mile $412.12, in addition to the "base charge. Exhibit 3. Counting the "base" charge, the 36-mile trip cost an incredible $1,421.65 *per mile*.

65. Plaintiff Kadambi was insured by Blue Cross & Blue Shield of South Carolina ("BCBS-SC"), and Defendants submitted their charges to BCBS-SC for payment. In response, BCBS-SC (unsurprisingly) determined that Defendants charged amount was unreasonable and reimbursed only $1,947.41 – an amount that is less than the amount Defendants claim they could charge after traveling two miles – and issued an EOB to that effect. Exhibit 3. Defendants' designated collection agency, Medicredit, Inc., balance billed Plaintiff Kadambi $49,232.14. Exhibit 3.

66.    Defendants requested Plaintiff to assist them in the appeal of the insurance determination in July 2018, which appeal was denied in 2019.

67.    Defendants sent Plaintiff Kadambi's bill to collections seeking the remaining balance of $49,232.14. Plaintiff Kadambi has been subjected to Defendants' billing collection practices as aforesaid, damaging his credit and causing substantial hardship.

68.    Plaintiff Kadambi did not enter any contract with Defendants regarding any the terms of transport and did not mutually asset to any contract with Defendants.

### Chris Epler

69.    On January 12, 2014, Plaintiff Epler suffered a traumatic hand injury at his home involving a table saw.

70.    Plaintiff Epler was admitted into Wuestoff Medical Center, where an emergency room physician determined that Plaintiff suffered from an emergency medical condition that required immediate transfer to Orlando Regional Medical Center in Orlando, Florida, for appropriate care. Wueshoff Medical Center contacted Defendants for the air transport and transfer to Orlando Hospital.  The healthcare providers executed a Certificate of Necessity for Air Medical Transport prepared by Defendants. *See* Exhibit 4.

71.    Defendants transported Plaintiff Epler approximately 50 miles from Wuestoff Medical Center to Orlando Regional Medical Center.

72.    Plaintiff Epler was insured by Anthem Blue Cross Blue Shield, and Defendants submitted their charges of $36,568.14 for payment. In response, Anthem determined that Defendants' charged amount was unreasonable and reimbursed only $5,943.79, issuing an EOB to that effect. *See* Exhibit 5. Defendants balanced billed Plaintiff Epler $30,624.35. *See* Exhibit 6.

73.    Defendants requested Plaintiff assist them in the appeal of the insurance determination, which appeal was denied.

74.    Defendants have sent Plaintiff Epler's debt to collections seeking the allegedly remaining balance of $30,624.35.  Plaintiff Epler has been subjected to Defendants' billing the collection practices as aforesaid, damaging his credit and causing substantial hardship. As a result of Defendants' billing and collection practices, Plaintiff Epler was compelled to pay Defendants monies he did not owe.

75.    Plaintiff Epler did not enter any contract with Defendants regarding any the terms of transport and did not mutually asset to any contract with Defendants.

76.    Defendants employed aggressive collection methods to attempt to collect the purported debt, including letters, telephone calls, and threatening that Epler's credit would suffer if he did not pay the remaining $30,624.34. Defendants referred the matter to a collection agency.

77.    Plaintiff Epler subsequently attempted to secure a home mortgage loan but was informed that the loan could not be made due to Defendants'

outstanding debt appearing on his credit report. Mr. Epler was compelled to pay $22,000.00 to settle the purported debt to close on his home mortgage.

### Francine Freeborn

78.    On March 18, 2017, Plaintiff Freeborn had a stroke caused by a clot in her brain and was taken to Citrus Medical Center in Inverness, Florida. Healthcare personnel at Citrus determined that Plaintiff Freeborn suffered from an emergency medical condition that required immediate transfer to Northside Hospital in St. Petersburg, Florida, for appropriate care. Citrus Hospital contacted Defendants for the air transport and transfer to Northside Hospital. The healthcare providers executed a Certificate of Necessity for Air Medical Transport prepared by Defendants.

79.    Defendants charged Plaintiff Freeborn $64,999.00 for her air transport.

80.    Plaintiff Freeborn was insured by Motion Picture Industry Health and Pension (MPI), to whom Defendants submitted their charges of $64,999.00 for payment. This charge was Defendants' excessive and arbitrary maximum charge when she was transported. In response, MPI determined that Defendants charged amount was unreasonable and reimbursed only $7,496.30, issuing an EOB to that effect. Exhibit 7. Defendants balanced billed Plaintiff Freeborn the remaining $57,502.70. *See* Exhibit 8.

81.    Defendants requested Plaintiff assist them in the appeal of the insurance determination, which appeal was denied.

82.    Defendants sent Plaintiff's "debt" to collections, seeking the allegedly remaining balance of $57,502.70. *See* Exhibit 9. Plaintiff Freeborn has been subjected to Defendants' billing practices as aforesaid, damaging her credit and causing substantial hardship.

83.    Plaintiff Freeborn did not enter any contract with Defendants regarding any the terms of transport and did not mutually asset to any contract with Defendants.

### Robert Cerone

84.    Plaintiff Cerone is a retired New York police officer. On October 29, 2020, Plaintiff Cerone fell off his roof and broke his leg. He had someone call 911 to request an ambulance lake him to the hospital. Plaintiff Cerone never called or requested anyone else to respond. Two different crews responded to the call. Subsequently, a second crew arrived and injected him with a narcotic and asked what insurance he had, after which Mr. Cerone informed them that he had Medicare and United Health Care.

85.    Plaintiff Cerone said he wanted to be transferred to Cleveland Clinic Tradition Hospital by ambulance, which is about 10 miles from his home where the accident occurred. The crew said they had to take him to Lawnwood Medical Hospital which is further away and denied Plaintiff's request regarding where he wanted to be transported.

86.    One of the emergency responders asked Plaintiff Cerone to sign a form, which he thought was for the ground ambulance transportation to the hospital but was instead for an air ambulance.

87.    Following the transport, Defendants billed Mr. Cerone $48,168.94, which included a "base" charge of $41,659.71 and an additional $6,509.23 for mileage. The trip was 15 miles, making the charge per mile $433.95, in addition to the "base" charge. Counting the "base" charge, the per-mile trip cost an eye-popping $3,211.26 **per mile**.

88.    Plaintiff Cerone was insured by Medicare with United Healthcare of New York as his supplemental health insurer. Defendants submitted their charges to United Healthcare for payment. Defendants' claim is still being processed by his insurer. *See* Exhibit 10.

89.    Plaintiff Cerone did not enter any contract with Defendants regarding any term of transport and did not mutually asset to any contract with Defendants.

90.    Plaintiff Cerone has been subjected to Defendants' oppressive billing and collection practices as aforesaid, damaging his credit and causing substantial hardship.

## JURISDICTION AND VENUE

91.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1331. Further, the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which Plaintiffs and members of the Class are citizens of states different from Defendants. This Court also has

federal question jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 and the ADA, 49 U.S.C. § 41713(b) (I).

92.    This Court has personal jurisdiction over Defendants because they are authorized to do business and are conducting business throughout the United States, including Florida. Defendants have sufficient minimum contacts with the State of Florida and/or sufficiently avail themselves of the markets of the State of Florida, thereby rendering proper the exercise of jurisdiction by this Court.

93.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial portion of the acts or omissions complained of occurred in this District.

94.    Venue is also proper because: (a) Defendants are authorized to conduct business in this District and have intentionally availed itself of the laws and markets within this District; (b) Defendants do substantial business in this District; and (c) Defendants are subject to personal jurisdiction.

## **DEFENDANTS' PRIOR STATE COURT LITIGATION**

95.    On information and belief. Defendants have, without any legal entitlement to payment:

    a.  filed multiple state-court breach-of-contract suits in multiple states to collect their charges, both by direct actions against a transported person and by way of making claims in interpleader actions;

    b.  filed proof of claims in multiple bankruptcy cases asserting a right to be paid based on state-law breach-of-contract theories;

    c.  filed claims in estate cases to recover their charges for transportation of a deceased person in multiple cases;

    d.  sought more compensation from Medicare, Medicaid and Tricare insureds than is allowed under the relevant payment schedule for providers that accept assignment of benefits from Medicare, Medicaid and Tricare patients;

    e.  sought compensation from patients with commercial insurance, employer-sponsored health benefits plan, and other non-governmental third-party payers with no enforceable contract;

    f.  coerced class members to enter payment plans to pay their full billed amount in monthly installments paid over decades with interest; and

    g.  enforced, or sought to enforce, subrogation claims or liens against personal injury claims or recoveries seeking their full-billed amounts.

96.    Defendants' collection efforts against Plaintiffs were ongoing at the time this action was filed, and Defendants will continue efforts to collect their improperly billed amounts in the absence of relief granted by the Court in this action.

97.    There is a live, ongoing, and actual controversy between Plaintiffs and Defendants.

## **CLASS ACTION ALLEGATIONS**

98.    This action is brought and may be maintained as a class action pursuant to Fed. R. Civ. P. 23. The requirements of Fed. R. Civ. P. 23 are met with respect to the Classes defined as: All individuals who have received emergency medical transport by Defendants from a location in Florida or who have been billed for such transport of another.

99.    Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest or which have a controlling interest of

Defendant, and Defendants' legal representatives, assigns and successors. Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.

100.    Plaintiffs expect to seek certification of the Class under FRCP 23(a), (b)(2), and/or (b)(3).

101.    Plaintiffs reserve the right to redefine the Class prior to class certification, and/or to request certification of an "issues" class under Rule 23(c)(4) if appropriate.

102.    The members of the Class are so numerous that joinder of all members is impracticable. The exact number of Class Members is unknown as such information is in the exclusive control of Defendants. However, due to the nature of the trade and commerce involved, Plaintiffs believe the Proposed Class consists of thousands of Class Members. As such, numerosity is established within the meaning of Rule 23(a)(1).

103.    Common questions of law and fact affect the rights of each Class Member and such questions are subject to common resolution, including at least the following:

    a.    Whether Class Members entered a voluntary agreement to pay the Defendants the charged amounts;

    b.    Whether Defendants disclosed the prices, including, but not limited to, their fixed mileage price and "helicopter rotor base" price for the transportation prior to transportation;

    c.    Whether the A&C and/or AOB create an express or implied-in-fact contract;

    d. Whether the ADA preempts Defendants from collecting amounts from Class Members for transport;

    e. Whether the Court should grant relief to Class Members who did not engage in any voluntary undertaking with Defendants for their transportation to prevent collection efforts by Defendants for the charged amounts;

    f. Whether Class Members who paid some or all of the charges are entitled to restitutionary relief for payment;

104. The claims and defenses of the named Plaintiffs are typical of the claims and defenses of the Class. Plaintiffs assert the same injury based on the same legal theory as those of all members of the Class. Moreover, Plaintiffs are not subject to any unique affirmative defenses precluding a finding of typicality. By pressing their own claims, Plaintiffs necessarily press the claims of each member of the Class.

105. Plaintiffs will fairly and adequately assert and protect the interests of the Class. Moreover, Plaintiffs have no interests antagonistic to or in conflict with those of the Class. Plaintiffs have hired attorneys who are experienced in successfully prosecuting class action and complex litigation claims and possess the resources to zealously litigate the claims asserted herein. As such, Plaintiffs and the undersigned will adequately represent the interests of the Class within the meaning of Rule 23(a)(4).

106. Class treatment is appropriate pursuant to Rule 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class such that declarative and injunctive relief is appropriate for the Class on the

whole. Specifically, Defendants have refused to, prior to transport, disclose their prices for air transportation, charge wildly excessive and outrageous rates to out-of-network insureds that far exceed the fair market price established by in-network insureds, and assert a contractual or equitable entitlement to payment that is preempted by the ADA above and beyond the reasonable amount paid by health insurer payors.

107.   Class treatment is also appropriate pursuant to Rule 23(b)(3) because common issues of law and fact predominate over any individual issues and because class treatment is superior to any other alternative forms of adjudication.

108.   The common issues identified herein are the centrally dispositive issues in this litigation. Individual issues, if any, are by comparison minor and/or easily addressed in post-judgment proceedings and do not threaten to overwhelm the litigation.

109.   Moreover, the central issues in this Action are questions of law, and Defendants' own business records easily identifies each and every member of the Class and the amounts to which Defendants claim they are entitled, such that this Action is easily manageable as a class action. The amounts at issue for each individual Class Member, while significant, is insufficient to warrant the cost and time of individual litigation against an extremely well-resourced, national corporation. Absent class treatment, it is unlikely – indeed, it is virtually impossible – that any individual Class Member could seek redress, as seen in the fact that, upon information and belief, no Florida citizen has sought individual

redress against Defendants, notwithstanding Defendants' aggressive, oppressive, and unconscionable charges and tactics for collecting on such illegitimate charges. This case is ideally and uniquely suitable for class treatment – the vindication of rights held by people who individually have little to no recourse, but collectively can assert their right to be free from the illegitimate and exploitative practices at issue.

110.    In this action, Patients, on behalf of themselves and the Proposed Class, seek:

    a.  to enjoin Defendants from engaging in any collection of their charged amounts from Class Members;

    b.  for a declaration addressing the respective legal rights of Class Members with respect to their obligation to pay and Defendants' right to receive payment in the absence of an enforceable contract;

    c.  for a declaration as to whether any contract exists between Defendants and Class Members, and if so, the terms of their bargain;

    d.  for a declaration regarding the legal rights of the Defendants to receive payment from any Class Member;

    e.  for a declaration as to Defendants' right to initiate and pursue collection efforts with respect to Balance Billed charges under the circumstances; and

    f.  for a declaration addressing the legal rights of the Parties with respect to the application of the ADA, 49 U.S.C. § 41713(b)(1), on the legal right of Defendants to charge and the legal obligation of Class Members to pay.

## CAUSE OF ACTION

### Injunctive and Declaratory Relief Pursuant to 28 U.S.C. § 2201

111.    Plaintiffs incorporate the previous paragraphs as though set forth herein.

112.    28 U.S.C §2201 provides as follows:

> In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

113.    Prior to the provision of services, no negotiation of contract terms regarding the price of Defendants' transportation services took place and Plaintiffs and Class Members did not enter any voluntary agreement with Defendants to pay the charged amounts for transport services.

114.    Defendants have engaged in and threatened collection efforts to recover, accumulated interest and fees on the unpaid balance, reported the unpaid charged amount as bad debt to credit reporting agencies, and ultimately filed suits in state court for the amounts charged, for the purpose of coercing Class Members into compromise payments that they do not owe.

115.    Plaintiffs seek declaratory relief for the purposes of determining questions of actual controversy between the Patients and Defendants.

116.    Defendants have acted in a uniform manner in (a) failing to enter into express agreements with respect to their charged amount for transportation

services before rendering those services, (b) seeking payment from third party payors, (c) balance billing Patients in the event the charged amounts are not paid, (d) reporting unpaid balances as bad debt, (e) engaging in collection efforts, including suit in state court, or under state law, and (f) coercing compromise payments that are not legally owed.

117.    There is an actual dispute and controversy between Plaintiffs and Class Members and Defendants concerning whether Defendants can (a) demand payment for services with respect to which the price term is silent, (b) engage in collection efforts where no legally enforceable contract exists, (c) impose interest and costs of collection on Plaintiffs and the Class, (d) attempt to collect the amounts charged under the circumstances, and (e) seek and receive payment for the legal obligations of plan beneficiaries beyond the amount determined by third party payors.

118.    Defendants have demanded payment from Plaintiffs, and initiated collection efforts claiming that the unpaid amounts demanded are bad debts and referred the demands to collection thereby adversely affecting Plaintiffs' credit.

119.    Plaintiffs have no adequate remedy at law.

120.    Plaintiffs seek declarations to determine their rights and the rights of the Proposed Class Members, in particular:

> a. The Court finds that Defendants and Plaintiffs, and the Class did not enter into any contract, either express or implied-in-fact, for Plaintiffs and the Class to pay the amounts charged by the Defendants for the transportation services it provided;

b. The Court finds that Defendants have engaged in collection efforts against s and the Class for amounts that the Plaintiffs and the Class did not contractually agree to pay;

c. The Court finds that Defendants have engaged in collection efforts against Plaintiffs and the Class for amounts concerning which there was no mutual assent manifest by the Plaintiffs and the Class prior to the rendering of the services charged;

d. The ADA pre-empts the imposition of any state common law contract principles that impose terms upon Plaintiffs which those parties did not expressly assent to prior to the air medical transportation services provided to them;

e. The Court finds that the emergency medical circumstances of Defendants' medical air transportation were such that patients transported cannot be implied to have entered into any contract for transportation, and in particular any agreement to pay whatever Defendants charged;

f. The Court finds that ADA pre-empts application of state law imposing or implying any agreement upon Plaintiffs to pay Defendants charged amounts; and

g. The Court finds that Defendants' collection of any sums, absent an enforceable contract with the Plaintiff charged, was unlawful and the sums received by Defendants disgorged.

121. Plaintiffs and the Proposed Class further seek a prospective order from the Court requiring Defendants to: (1) cease all balance billing and collection efforts with respect to outstanding bills for air medical transportation service until this Court determines Defendants' legal entitlement to payment of its charged amounts; and (2) account for all sums collected for air medical transportation services provided to Plaintiffs.

122. Defendants' collection efforts damage the credit of Plaintiffs and the Class, have caused, and continue to cause Plaintiffs and those in the Plaintiffs'

Class anxiety, embarrassment and humiliation; have caused them to incur legal fees and litigation expenses; exposed Plaintiffs and the Class to claims for interest on unpaid Defendants' charges and vexing and harassing collection efforts. Because of Defendants' practices as described above, Plaintiffs and the Proposed Class have suffered, and will continue to suffer, irreparable harm and injury.

123.    Accordingly, Plaintiffs and Members of the Proposed Class respectfully ask the Court to issue an injunction ordering Defendants to (1) cease and desist their practice of filing third-party reimbursement claims absent an enforceable contract to collect their charged amount; (2) provide for an accounting of all sums received by Defendants during the last 10 years, where Defendants submitted a claim to third-party payors payment without basing that claim on a contract with the transported party; and (3) such other necessary and proper relief that may be appropriate following the determination of the declarations made.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of the Class of persons described herein, prays for an Order as follows:

    a) Entering an order certifying the Class designating Plaintiffs as the class representatives, and designating the undersigned as class counsel;

    b) Awarding Plaintiffs all costs and disbursements, including attorneys' fees, experts' fees, and other class action related expenses;

    c) Imposing a constructive trust, where appropriate, on amounts received by Defendants from third-parties, or Plaintiffs in the absence of a contract with the transported party;

d) Issuing appropriate declaratory and injunctive relief, as requested in the Complaint, including to declare the whether the parties have an enforceable contract for the payment of Defendants' services together with the terms of that contract; the respective rights and obligations under the contract; and, the impact of the Air Line Deregulation Act preemption provisions have on the party's respective rights and obligations under that contract;

e) Awarding pre-judgment and post-judgment interest; and

f) Granting such further relief as the law allows and the Court deems just.

Plaintiffs hereby demand a trial by jury on all claims and issues.

DATED March 11, 2021.

*/s/ Jake Phillips*
Jacob Phillips
FBN: 0120130
Edmund Normand
FBN: 0865990
Amy Judkins
FBN: 125046
**NORMAND PLLC**
3165 McCrory Pl., Ste. 175
Orlando, FL, 32801
Tel: (407) 603-6031
jacob.phillips@normandpllc.com
ed@ednormand.com
amy.judkins@normandpllc.com
ean@normandpllc.com

Edward L. White, OBA #16549*
**Edward L. White P.C.**
829 East 33rd Street
Edmond, Oklahoma 73013
Telephone: (405) 810-8188
Facsimile: (405) 608-0971
ed@edwhitelaw.com

Richard J. Burke*
Zachary A. Jacobs*
**Quantum Legal LLC**
2801 Lakeside Drive, Suite 100
Bannockburn, IL 60025-1211
Telephone: (847) 433-4500
Facsimile: (847) 433-2500
richard@qulegal.com
zachary@qulegal.com

J. Preston Strom, Jr.*
Fed. I.D. No. 4354
Mario A. Pacella*
Fed. I.D. No. 7538
6923 N. Trenholm Rd. Suite 200
Columbia, SC 29206
Telephone: (803) 252-4800
Facsimile: (803) 252-4801
 petestrom@stromlaw.com
mpacella@stromlaw.com

Jonathan Shub*
Kevin Laukaitis*
**SHUB LAW FIRM LLC**
134 Kings Hwy. E.
2nd Floor
Haddonfield, NJ 08033
T: 856-772-7200
F: 856-210-9088
jshub@shublawyers.com
klaukaitis@shublawyers.com

*pro hac vice forthcoming*